Jack Silver, Esq. SB #  160575
Email: lhm28843@sbcglobal.net
LAW OFFICE OF JACK SILVER
Jerry Bernhaut, Esq. SB # 206264
Email: j3bernhaut@gmail.com
Post Office Box 5469
Santa Rosa, CA 95402-5469
Tel    (707) 528-8175
Fax.   (707) 528-8675

Attorneys for Plaintiff
CALIFORNIA RIVER WATCH

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA RIVER WATCH, an IRC Section 501(c)(3) non-profit, public benefit corporation, | CASE NO. |
| Plaintiff | **COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL PENALTIES, RESTITUTION AND REMEDIATION** (**Environmental - Clean Water Act  - 33 U.S.C. § 1251, *et seq*)** |
| v. | |
| SONOMA VALLEY COUNTY SANITATION and SONOMA COUNTY WATER AGENCY, | |
| Defendant. | |

CALIFORNIA RIVER WATCH ("RIVER WATCH "), an Internal Revenue Code Section 501(c)(3) non-profit, public benefit corporation, by and through its counsel, hereby alleges:

I.      **NATURE OF THE CASE**

1.      This is a citizens' suit for relief brought by RIVER WATCH under the Federal Water Pollution Control Act, also known as the Clean Water Act ( "CWA"), 33 U.S.C. §1251 et seq., specifically CWA § 505, 33 U.S.C. §1365, CWA § 301, 33 U.S.C. § 1311, and CWA § 402, 33 U.S.C. § 1342, to prevent Defendants SONOMA VALLEY COUNTY SANITATION DISTRICT and SONOMA COUNTY WATER AGENCY (collectively hereafter, "SONOMA") from repeated and ongoing violations of the CWA.  These violations are detailed in the Notice of Violations and Intent to File Suit dated January 13, 2015 ("CWA NOTICE") made part of this pleading and attached hereto as EXHIBIT A.

2.      Defendant Sonoma Valley County Sanitation District owns, and Defendant Sonoma County Water Agency operates, the Sonoma Valley County Sanitation District Wastewater Treatment Plant ("the Plant") and its associated wastewater collection system consisting of approximately 135 miles of gravity sewer lines, 48 miles of laterals, 3 miles of force main, and 2 pump stations.  SONOMA is regulated under the supervision of the Sonoma County Board of Supervisors which sits as the Board of Directors of both entities. SONOMA provides sewerage services for a population of approximately 36,000 in the City of Sonoma and the unincorporated areas of Glen Ellen, Boyes Hot Springs, El Verano, and Agua Caliente, in the Sonoma Valley area.

3.      RIVER WATCH contends SONOMA is routinely violating the CWA by exceeding the effluent discharge standards or limitations in the National Pollutant Discharge Elimination System ("NPDES") Permits under which the Plant and its associated wastewater collection system are regulated.

4.      RIVER WATCH contends SONOMA is also routinely violating the RWQCB's Water Quality Control Plan ("Basin Plan,") Environmental Protection Agency ("EPA") regulations codified in the Code of Federal Regulations, and toxics standards promulgated by the State Water Resources Control Board, in the course of SONOMA's operation of the Plant and its associated wastewater collection system as described in the CWA NOTICE.

5.      RIVER WATCH contends SONOMA illegally discharges pollutants from the Plant and its associated wastewater collection system to waters of the United States which are habitat for threatened or endangered species as that term is defined by the California EPA and the United States EPA.

6.      RIVER WATCH seeks declaratory relief, injunctive relief to prohibit future violations, the imposition of civil penalties, and other relief for SONOMA's violations of the CWA.

## II.    PARTIES TO THE ACTION

7.      Plaintiff CALIFORNIA RIVER WATCH is an Internal Revenue Code § 501(c)(3) non-profit, public benefit corporation organized under the laws of the State of California, with

headquarters located in Sebastopol, California and offices in Los Angeles, California. RIVER WATCH's southern California mailing address is 7401 Crenshaw Boulevard, #422, Los Angeles, California 90043. The specific purpose of RIVER WATCH is to protect, enhance and help restore surface and ground waters of California including rivers, creeks, streams, wetlands, vernal pools, aquifers and associated environs, biota, flora and fauna; and, to educate the public concerning environmental issues associated with these environs.

8.     Members of RIVER WATCH live nearby to waters and watersheds affected by SONOMA's illegal discharges as alleged herein.  Said members have interests in the waters and watersheds identified in this Complaint, which interests are or will be adversely affected by SONOMA's violations of the CWA.  Said members use the effected waters and watershed areas for domestic water, recreation, sports, fishing, swimming, hiking, photography, nature walks, and the like.

9.     RIVER WATCH is informed and believes and on such information and belief alleges that Defendant SONOMA VALLEY SANITATION DISTRICT is now, and at all times relevant to this Complaint was, a service district which began operations in 1953 and owns the Plant and its associated wastewater collection system.  The service area for SONOMA VALLEY SANITATION DISTRICT is 4,500 acres.  It currently services more than 17,000 equivalent single-family dwellings. The Board of Directors for SONOMA VALLEY SANITATION DISTRICT consists of: the mayor of the City of Sonoma, the First District Supervisor for the Sonoma County Board of Supervisor, and Chair of the Sonoma County Board of Supervisors.

10.     RIVER WATCH is informed and believes and on such information and belief alleges that Defendant SONOMA COUNTY WATER AGENCY is now, and at all times relevant to this Complaint was, created as a special district in 1949 by the California Legislature to provide flood protection and water supply services.  Legislation enacted in 1995 added the treatment and disposal of wastewater to its responsibilities.  Administrative offices are located at 404 Aviation Boulevard, Santa Rosa, California.  The Sonoma County Board of Supervisors acts as the SONOMA COUNTY WATER AGENCY's Board of Directors.

//

### III.   JURISDICTIONAL ALLEGATIONS

11.    Under 33 U.S.C. § 1251(e), Congress declared its goals and policies with regard to public participation in the enforcement of the CWA.  33 U.S.C. § 1251(e) provides, in pertinent part:

"Public participation in the development, revision, and enforcement of any regulation, standard, effluent limitation, plan or program established by the Administrator or any State under this chapter shall be provided for, encouraged, and assisted by the Administrator and the States. "

12.    Subject matter jurisdiction is confered upon this Court by Section 505(a)(1) of the CWA, 33 U.S.C. § 1365(a)(1), which states in part,

"any citizen may commence a civil action on his own behalf against any person . . . .who is alleged to be in violation of (A) an effluent standard or limitation . . . . or (B) an order issued by the Administrator or a State with respect to such a standard or limitation." For purposes of Section 505, "the term 'citizen' means a person or persons having an interest which is or may be adversely affected."

13.    Members and supporters of RIVER WATCH reside in the vicinity of, enjoin visiting the area, derive livelihoods from, own property near, and/or recreate on, in or near and/or otherwise use, enjoy and benefit from the waterways and associated natural resources into which SONOMA discharges pollutants, or by which SONOMA's operations of the Plant and its associated wastewater collection system adversely affect said members' interests, in violation of  CWA § 301(a), 33 U.S.C.§1311(a). The health, economic, recreational, aesthetic and environmental interests of RIVER WATCH and its members may be, have been, are being, and will continue to be adversely affected by SONOMA's unlawful violations of the CWA as alleged in this Complaint.  RIVER WATCH and its members contend there exists an injury in fact to them, causation of that injury by SONOMA's complained of conduct, and a likelihood that the requested relief will redress that injury.

14.    Pursuant to CWA § 505(b)(1)(A), 33 U.S.C.§1365(b)(1)(A), notice of the CWA violations alleged in this Complaint was given more than sixty (60) days prior to commencement of this lawsuit, to: (a) SONOMA, (b) the United States EPA, Federal and Regional, and (c) the State of California Water Resources Control Board.

15.     Pursuant to CWA § 505(c)(3), 33 U.S.C. § 1365(c)(3), a copy of this Complaint has been served on the United States Attorney General and the Administrator of the Federal EPA.

16.     Pursuant to CWA § 505(c)(1), 33 U.S.C. § 1365(c)(1), venue lies in this District as the Plant and its associated wastewater collection system and the sites where illegal discharges occurred, which are the source of the violations complained of in this action, are located within this District.

## IV.     GENERAL ALLEGATIONS

17.     RIVER WATCH incorporates by reference all the foregoing including the CWA NOTICE as though the same were separately set forth herein.

18.     The Plant has an average dry weather design flow of 3.0 million gallons per day ("mgd") and a peak wet weather design flow of 16 mgd.  The Plant discharges secondary and tertiary treated effluent to Schell Slough, and tertiary treated effluent to Wetland Management Unit 1, Wetland Management Unit 3, Napa-Sonoma Salt Marsh, and Fly Bay, all within the San Pablo Bay watershed. These marshlands and ponds, where water is stored for summer recycling, attract thousands of overwintering and migratory birds.

19.     SONOMA has a long history of sewage system overflows ("SSOs") from aging sewer lines in its wastewater collection system which have insufficient capacity to handle current flow.  Sixty percent of the sewer lines were constructed prior to 1960.  Half of those were constructed  prior to 1940.  Structural defects in the wastewater collection system, which allow inflow and infiltration (I/I) of rainwater and groundwater into the sewer lines, result in a buildup of pressure, which causes SSOs.  Overflows caused by insufficient capacity, blockages and I/I result in the discharge of raw sewage onto land and into gutters, canals, and storm drains which are connected to adjacent surface waters, such as Agua Caliente Creek, Fryer Creek,  Nathanson Creek,  Pequeno Creek, Sonoma Creek, and Verano Creek – all waters of the United States.

20.     SONOMA has been assessing and making improvements to its wastewater collection system, however as recorded in the State Water Resource Control Board's California Integrated Water Quality System ("CIWQS") Public SSO Reports, SONOMA's wastewater

collection system has experienced 53 SSOs between December 8, 2009 and December 8, 2014, with a combined volume of 361,551 gallons – 358,509 of which reached surface waters.  For example, on February 8, 2014 a spill occurred at 18715 Sonoma Highway in Sonoma.  The total estimated volume of the spill was 56,250 gallons, all of which reached a surface water, impacting Agua Caliente Creek.  The spill continued for a day and a half, ending early on February 10, 2014.  On the same day (February 8, 2014)  a spill of 39,400 gallons occurred at the Rancho Vista Mobile Home Park in the City of Sonoma, reaching Pequeno Creek and Sonoma Creek, none of which was recovered.  Between February 8th and 9th, 2014, the wastewater collection system experienced a total of 7 SSOs, including the instances referenced above, totaling 125,320 gallons, all of which reached surface waters.  Also, on December 23, 2012, there were 6 SSO events totaling 39,563 gallons. As with most of the spills from SONOMA's wastewater collection system, none of the spill was recovered, and all reached surface waters.

21.    RIVER WATCH's expert believes that many of SONOMA's SSOs were of greater volume than reported.  SONOMA has a history of non-compliance with the SSO reporting requirements mandated by the Statewide General Requirements for Sanitary Sewer Systems, Waste WDR Order No. 2006-0003-DWQ ("Statewide WDR") governing the operation of sanitary sewer systems.  The Statewide WDR requires sewer system operators to report SSOs to the CIWQS Reporting System and include in that reporting an estimate of the volume of any spill, the volume recovered, and the volume which reached a surface water.  The majority of field reports filed with the CIWQS by SONOMA indicate the SSO start time as the same time upon which SONOMA was notified of the SSO.  Some reports indicate the spill start, notification, and operator arrival time as the same.  The report of the Sonoma Highway spill mentioned in Paragraph 19 above, indicates the time the spill was estimated to have started and the time SONOMA was notified as 11:15:00, exactly the same time. In reporting the spill that occurred at Rancho Vista Mobile Home Park, SONOMA's field report lists the estimated spill start time, agency notification time, and operator arrival time all as 14:40:00. These equivalencies are highly unlikely, and result in an underestimation of the duration of the spill.

Complaint

22.     Studies have shown that SSOs are usually noticed significantly after they have begun.   Since the volume of an SSO of any significance is estimated by multiplying the estimated flow rate by the duration, SONOMA's common practice of estimating a later than actual start time leads to an underestimation of both the duration and the volume of the spill. Some reports filed by SONOMA with the CIWQS do not indicate what method was used to estimate the total volume of the spill; and, when an explanation is provided, it is an estimation of gallons per minute based upon the duration of the spill.   RIVER WATCH contends that SONOMA is regularly underestimating the incidence and volume of SSOs from its wastewater collection system that reach surface waters.

23.     In addition to surface overflows which discharge over land into surface waters, underground leakages ("exfiltration") caused by pipeline cracks and other structural defects in a collection system can result in discharges to adjacent surface waters via underground hydrological connections. Studies tracing human markers specific to the human digestive system in surface waters adjacent to defective sewer lines in other systems have verified the contamination of the adjacent waters with untreated sewage.[1]

24.     RIVER WATCH contends significant sections of SONOMA's wastewater collection system are old and in need of repair.   Untreated sewage is discharged from cracks, displaced joints, eroded segments, etc., into groundwater which is hydrologically connected to surface waters.   RIVER WATCH alleges that such discharges are continuous wherever aging, damaged, structurally defective sewer lines in SONOMA's wastewater collection system are located adjacent to surface waters, including Agua Caliente Creek, Nathanson Creek, and Sonoma Creek. Surface waters and groundwater become contaminated with fecal coliform, exposing people to human pathogens.   SONOMA's chronic wastewater collection system failures pose a substantial threat to public health. Exfiltration from SONOMA's wastewater collection system is a daily occurrence and a violation of its NPDES permits and the CWA.

25.     Numerous critical habitat areas are found within areas of SONOMA's SSOs.

---

[1] See the Report of Human Marker Study issued July, 2008 conducted by Dr. Michael L. Johnson, U.C. Davis water quality expert, performed for the City of Ukiah, finding the presence of human derived bacteria in two creeks adjacent to defective sewer lines.

Sonoma Creek and surrounding waterways, as well as the San Pablo Bay, are relied upon by many endangered and threatened species including the California brown pelican, California clapper rail, chinook salmon, salt marsh harvest mouse, and steelhead trout. The San Pablo Bay National Wildlife Refuge is located where Sonoma Creek drains to San Pablo Bay. Sonoma Creek, Agua Caliente Creek, Nathanson Creek, San Pablo Bay, and San Francisco Bay have many beneficial uses as defined in the RWQCB's Basin Plan including fish spawning, preservation of rare and endangered species, and water contact recreation. SSOs reaching these waterways cause prohibited pollution by unreasonably affecting the beneficial uses of these waters. SONOMA is also required by its NPDES Permits to comply with narrative standards as set forth in the Basin Plan, used when testing by numeric standards would be inadequate or impractical. Those narrative standards include the following:

- Waters shall not contain taste or odor producing substances in concentrations that impart undesirable tastes or odors to fish flesh;

- Waters shall not contain floating material in concentrations that cause nuisance or affect beneficial uses;

- The pH shall not change within 0.5 units of the range needed for COLD or WARM beneficial uses, such as cold water habitat for fish;

- The bacteriological quality of waters shall not be degraded beyond natural background levels; and,

- Natural receiving water temperatures shall not be altered unless allowed by the RWQCB.

RIVER WATCH has found nothing in the public record to demonstrate that SONOMA has monitored for and complied with these narrative standards. RIVER WATCH is understandably concerned regarding the effects of both surface and underground SSOs on critical habitat in and around the San Pablo Bay and its tributaries.

26. Between December 8, 2009 and December 8, 2014, SONOMA incurred 17 violations of the effluent limits set forth in its NPDES Permits for copper, 7 violations of the effluent limits for chronic toxicity, 4 for cyanide, and 1 for chlorine residual.

27.     All illegal discharges and activities complained of in this Complaint occurred in the waterways named in the CWA NOTICE and in this Complaint, all of which are waters of the United States.

**V.     STATUTORY AND REGULATORY BACKGROUND**

28.     CWA § 301(a), 33 U.S.C. § 1311(a), prohibits the discharge of pollutants from a "point source" into the navigable waters of the United States, unless such discharge is in compliance with applicable effluent limitations as set by the EPA and the applicable State agency.   These limits are to be incorporated into an NPDES permit for that point source specifically. The effluent discharge standards or limitations specified in a NPDES Permit define the scope of the authorized exception to the CWA § 301(a), 33 U.S.C. § 1311(a), prohibition, such that violation of a permit limit places a polluter in violation of CWA § 301(a), 33 U.S.C. § 1311(a) and thus in violation of the CWA. Additional sets of regulations are set forth in the Basin Plan, California Toxics Rule, the Code of Federal Regulations and other regulations promulgated by the EPA and the State Water Resources Control Board.   CWA § 301(a), 33 U.S.C. § 1311(a) prohibits discharges of pollutants or activities not authorized by, or in violation of an effluent standard or limitation or an order issued by the EPA or a State with respect to such a standard or limitation including an NPDES permit issued pursuant to CWA § 402, 33 U.S.C. § 1342.  The Plant and associated collection system owned and operated by SONOMA are point sources under the CWA.

29.     The CWA provides that authority to administer the NPDES permitting system in any given state or region can be delegated by the EPA to a state or to a regional regulatory agency, provided that the applicable state or regional regulatory scheme under which the local agency operates satisfies certain criteria (*see* 33 U.S.C. § 1342(b)).  In California, the EPA has granted authorization to a state regulatory apparatus comprised of the State Water Resources Control Board and several subsidiary regional water quality control boards to issue NPDES permits. The entity responsible for issuing NPDES permits and otherwise regulating SONOMA's operations of the Plant and its associated wastewater collection system is the RWQCB.

30.     The Plant and its associated collection system are currently regulated under Order

No R2-2014-0020, NPDES Permit No. CA0037800, adopted by the RWQCB on May 14, 2014 and effective as of July 1, 2014; and formerly regulated under Order No. R2-2008-0090, NPDES Permit No. CA0037800, adopted by the RWQCB on October 8, 2008 and effective as of December 1, 2008. RIVER WATCH alleges SONOMA has committed numerous violations of its NPDES Permits, as detailed herein and in the CWA NOTICE. All violations of a duly authorized NPDES Permit are a violation of the CWA.

31.     The affected waterways detailed in this Complaint and in the CWA NOTICE are navigable waters of the United States within the meaning of CWA § 502(7), 33 U.S.C. § 1362(7).

## VI.   VIOLATIONS

32.     RIVER WATCH alleges that SONOMA's violations as detailed herein and in the CWA NOTICE, are violations of CWA § 301(a), 33 U.S.C. § 1311(a). The violations are established in RWQCB files for the Plant and its associated wastewater collection system, as well as in studies conducted by SONOMA in compliance with orders from regulatory agencies.

33.     The enumerated violations are detailed above and in the CWA NOTICE incorporated by designating the section of the CWA violated and describing the   activity constituting a violation.

34.     The location of the discharges are the discharges points as described in the CWA NOTICE and in this Complaint.

## VII.   CLAIM FOR RELIEF

### Violation of CWA  § 301(a), 33 U.S.C. § 1311(a)

### Discharges of a Pollutant From a Point Source to Waters of the United States

35.     RIVER WATCH  realleges and incorporates by reference the allegations of Paragraphs 1 though 34 above including the CWA NOTICE as though fully set forth herein. RIVER WATCH is informed and believes and based upon such information and belief alleges as follows:

36.     SONOMA has violated and continues to violate the CWA as evidenced by the discharges of pollutants from a point source (the sewer lines making up SONOMA's collection

system) to adjacent waters of the United States in violation of Sections III. A, III.C and III.E of Order R2-2014-0020, NPDES Permit No. CA0037800, and Sections III. A, III.D and III.E of Order R2-2008-0090, NPDES Permit No. C 0037800, and in violation of CWA § 301(a), 33 U.S.C. § 1311(a).

37. SONOMA has violated and continues to violate CWA § 301(a), 33 U.S.C. § 1311(a), as evidenced by the discharges of pollutants from a point source (discharge point 001) to Schell Slough, whereby, as recorded in SONOMA's self monitoring reports, some of the discharged wastewater exceeded effluent limits as set forth in SONOMA's NPDES Permits including:

Chronic Toxicity -   Section IV.E. Order R2-2014-0020, NPDES Permit No. CA0037800

                     Section IV.A. Order R2-2008-0090, NPDES Permit No. CA0037800

Copper -             Section IV.B. Order R2-2008-0090, NPDES Permit No. CA0037800

Chlorine Residual -  Section IV.A. Order R2-2008-0090, NPDES Permit No. CA0037800

Cyanide -            Section IV.B. Order R2-2008-0090, NPDES Permit No. CA0037800,

38. The violations of SONOMA are ongoing and will continue after the filing of this Complaint. RIVER WATCH alleges herein all violations which may have occurred or will occur prior to trial, but for which data may not have been available or submitted or apparent from the face of the reports or data submitted by SONOMA to the RWQCB or to RIVER WATCH prior to the filing of this Complaint. RIVER WATCH will amend this Complaint if necessary to address SONOMA's State and Federal violations which may occur after the filing of this Complaint. Each of SONOMA's violations is a separate violation of the CWA.

39. RIVER WATCH avers and believes and on such belief alleges that without the imposition of appropriate civil penalties and the issuance of appropriate equitable relief, SONOMA will continue to violate the CWA as well as State and Federal standards with respect to the enumerated discharges and releases. RIVER WATCH avers and believes and on such belief alleges that the relief requested in this Complaint will redress the injury to RIVER WATCH and its members, prevent future injury, and protect their interests which are or may be adversely affected by SONOMA's violations of the CWA, as well as other State and Federal

1  standards.

2  **VIII.   PRAYER FOR RELIEF**

3      RIVER WATCH prays this Court grant the following relief:

4  1.    Declare SONOMA to have violated and to be in violation of the CWA;

5  2.    Issue an injunction ordering SONOMA to immediately operate the Plant and its
6  associated wastewater collection system in compliance with the CWA;

7  3.    Order SONOMA to perform the following remedial measures:

8      a.    The repair or replacement, within two (2) years, of all sewer lines in SONOMA's
9  wastewater collection system located within two hundred (200) feet from surface
10  waters, which have been inspected via closed circuit television (CCTV) within the
11  past five (5) years and were rated as Significantly Defective under the Pipeline
12  Assessment and Certification Program ("PACP") rating system;

13      b.    A Surface Water Condition Assessment, by way of CCTV, within two (2) years,
14  of sewer lines in SONOMA's wastewater collection system located within two
15  hundred (200) feet of surface waters, which have not been CCTV'd within the past
16  five (5) years;

17      c.    Within two (2) years after completion of the Surface Water Condition Assessment,
18  the repair or replacement of all sewer lines in SONOMA's wastewater collection
19  system which have been found to be Significantly Defective under the PACP
20  rating system;

21      d.    Beginning no more than one (1) year after completion of the Surface Water
22  Condition Assessment, the commencement of a Full Condition Assessment by
23  way of CCTV inspection of all sewer lines in SONOMA's wastewater collection
24  system not within 200 feet of a surface water, to be completed within seven (7)
25  years. Any sewer pipe segment found to be Significantly Defective under the
26  PACP rating system to be repaired or replaced within two (2) years of the rating
27  determination;

28  //

e.  Modification of SONOMA's Backup and SSO response plan to include the method or calculations used for estimating total spill volume, spill volume that reached surface waters and estimating spill volume recovered.  For Category I Spills, creation of a listing of nearby residents or business owners who have been contacted to attempt to establish the SSO start time, duration, and flow rate, if such start time, duration, and flow rate have not been otherwise reasonably ascertained (such as from a caller who provides information with a given time that the SSO began). Taking of photographs of the manhole flow at the SSO site using the San Diego Method array, if applicable to the SSO; or other photographic evidence that may aid in establishing the spill volume;

f.  A requirement for water quality sampling and testing whenever it is estimated that fifty (50) gallons or more of untreated or partially treated waste water from a SSO enters surface waters.  Constituents tested for to include: ammonia, fecal coliform, E. coli and a CAM-17 toxic metal analysis. SONOMA shall collect and test samples from three (3) locations: the point of discharge, upstream of the point of discharge, and downstream of the point of discharge. If any of said constituents are found at higher levels in the point of discharge sample and the downstream sample than in the upstream sample, SONOMA shall determine and address the cause of the SSO that enters surface waters, and employ the following measures to prevent future overflows: (1) if the SSO is caused by a structural defect, then immediately spot repair the defect or replace the entire line; (2) if the defect is non-structural, such as a grease blockage or vandalism to a manhole cover, then perform additional maintenance or cleaning, and any other appropriate measures to fix the non-structural defect.

g.  The creation of website capacity to track information regarding SSOs; or, in the alternative, the creation of a link from SONOMA's website to the CIWQS SSO Public Reports. Notification to all customers and other members of the public of the existence of the web based program, including a commitment to respond to

1        private parties submitting overflow reports;

2     h.    Performance of human marker sampling on creeks, rivers, and wetlands adjacent

3        to significantly defective sewer lines to test for sewage contamination from

4        exfiltration;

5     i.    Creation of a protocol, in consultation with a registered Environmental Health

6        Specialist or  biologist, for remediation procedures to be implemented as part of

7        SONOMA's SSO response whenever a SSO of 1,000 gallons or more discharges

8        to surface waters.

9     j.    Creation of a mandatory, private sewer lateral inspection and repair program

10       triggered by any of the following events: transfer of ownership of the property if

11       no inspection/replacement of the sewer lateral occurred within twenty (20) years

12       prior to the transfer; the occurrence of two (2) or more SSOs caused by the private

13       sewer lateral within two (2) years; a change of the use of the structure served (a)

14       from residential to non-residential use, (b) to a non-residential use that will result

15       in a higher flow than the current non-residential use, and (c) to non-residential

16       uses where the structure served has been vacant or unoccupied for more than three

17       (3 )years; upon replacement or repair of any part of the sewer lateral; upon

18       issuance of a building permit with a valuation of $25,000.00 or more; upon

19       significant repair or replacement of the main sewer line to which the lateral is

20       attached.

21  4.    Order SONOMA to pay civil penalties of $37,500.00 per violation/per day for its

22     violations of the CWA;

23  5.    Order SONOMA to pay the reasonable attorneys' fees and costs of RIVER WATCH

24     (including expert witness fees), as provided by 33 U.S.C. § 1365(d), and applicable

25     California law; and,

26  6.    For such other and further relief as the court deems just and proper.

27  DATED: March 19, 2015          _____

                          JACK SILVER

28                     Attorney for Plaintiff

                          CALIFORNIA RIVER WATCH



# EXHIBIT A

# Law Office of Jack Silver



P.O. Box 5469        Santa Rosa, California 95402

Phone  707-528-8175      Fax  707-528-8675

lhm28843@sbcglobal.net

*VIA CERTIFIED MAIL*
*RETURN RECEIPT REQUESTED*

January 13, 2015

Grant Davis, General Manager
Sonoma County Water Agency
404 Aviation Boulevard
Santa Rosa, CA 95403

Sonoma County Board of Supervisors
Acting as Board of Directors for the
Sonoma County Water Agency
575 Administration Drive, Room 100A
Santa Rosa, CA 95403

**Re:        Notice of Violations and Intent to File Suit Under the Clean Water Act**

Dear Mr. Davis and Members of the Board:

**STATUTORY NOTICE**

This Notice is provided on behalf of California River Watch ("River Watch") in regard to violations of the Clean Water Act ("CWA" or "Act;" 33 U.S.C. § 1251 *et seq*.) that River Watch believes are occurring at the Sonoma Valley County Sanitation District Wastewater Treatment Plant ("the Plant") and its associated collection system.  River Watch hereby places the Sonoma Valley County Sanitation District and the Sonoma County Water Agency, (hereafter collectively referred to as "Sonoma") as owners and operator of the Plant and its associated collection system on notice, that following the expiration of 60 days from the date of this Notice, River Watch will be entitled under CWA § 505(a), 33 U.S.C. § 1365(a), to bring suit in the U.S. District Court against for continuing violations of an effluent standard or limitation, permit condition or requirement, or a Federal or State Order or Permit issued under CWA § 402 pursuant to CWA § 301(a), and consistent with the Code of Federal Regulations, and  the Regional Water Quality Control Board, San Francisco Bay Region, Water Quality Control Plan ("Basin Plan"), as the result of alleged violations of permit conditions or limitations in Sonoma's National Pollutant Discharge Elimination System ("NPDES") Permit.

Notice of Violations Under CWA - Page 1

River Watch takes this action to ensure compliance with the CWA which regulates the discharge of pollutants into navigable waters. The statute is structured in such a way that all discharges of pollutants are prohibited with the exception of enumerated statutory provisions. One such exception authorizes a discharger, who has been issued a permit pursuant to CWA § 402, to discharge designated pollutants at certain levels subject to certain conditions. The effluent discharge standards or limitations specified in a NPDES permit define the scope of the authorized exception to the CWA § 301(a), 33 U.S.C. § 1311(a), prohibition, such that violation of a permit limit places a polluter in violation of the CWA.

The CWA provides that authority to administer the NPDES permitting system in any given state or region can be delegated by the Environmental Protection Agency ("EPA") to a state or to a regional regulatory agency, provided that the applicable state or regional regulatory scheme under which the local agency operates satisfies certain criteria (*see* 33 U.S.C. § 1342(b)). In California, the EPA has granted authorization to a state regulatory apparatus comprised of the State Water Resources Control Board ("SWRCB") and several subsidiary regional water quality control boards to issue NPDES permits. The entity responsible for issuing NPDES permits and otherwise regulating Sonoma's operations in the region at issue in this Notice is the Regional Water Quality Control Board, San Francisco Bay Region ("RWQCB"). While delegating authority to administer the NPDES permitting system, the CWA provides that enforcement of the statute's permitting requirements relating to effluent standards or limitations imposed by the Regional Boards can be ensured by private parties acting under the citizen suit provision of the statute (*see* 33 U.S.C. § 1365). River Watch is exercising such citizen enforcement to enforce compliance by Sonoma with its NPDES permit.

## NOTICE REQUIREMENTS

The CWA requires that any Notice regarding an alleged violation of an effluent standard or limitation, or of an order with respect thereto, shall include sufficient information to permit the recipient to identify the following:

1.   *The specific standard, limitation, or order alleged to have been violated.*

River Watch identifies in this Notice specific standards and limitations of RWQCB Order No. R2-2014-0020, NPDES No. CA0037800 as well as Order No. R2-2008-0090, as being violated. A violation of the NPDES permit is a violation of the CWA.

2.      *The activity alleged to constitute a violation.*

Most often, the NPDES Permit standards and limitations being violated are self-explanatory and an examination of the language of the Permit itself is sufficient to inform Sonoma of its failure to fully comply with the Permit requirements.  This is especially so since Sonoma is responsible for monitoring its operations to ensure compliance with all permit conditions.   River Watch, however, sets forth narratives in this Notice describing with particularity the activities it alleges as violations.  River Watch does so following a review of public records relating to Sonoma's operations at the Plant.  Additional records and other public documents in Sonoma's possession or otherwise available to Sonoma regarding its NPDES Permit (all of which are hereby incorporated by reference) may, upon discovery, reveal additional violations.

River Watch contends that from December 8, 2009 through December 8, 2014, Sonoma violated requirements of Sonoma's NPDES Permit, the Basin Plan and the Code of Federal Regulations, as those requirements are referenced in the NPDES Permit, with respect to the Plant and its associated collection system, as further set forth in this Notice.

3.      *The person or persons responsible for the alleged violation.*

The entity responsible for the alleged violations identified in this Notice is the Sonoma Valley County Sanitation District managed by the Sonoma County Water Agency, identified collectively in this Notice as "Sonoma", as owners and operators of the Sonoma Valley County Sanitation District Wastewater Treatment Plant and its related collection system, as well as Sonoma's employees responsible for compliance with Sonoma's NPDES Permit.

4.      *The location of the alleged violation.*

The location or locations of the various violations are identified in Sonoma's NPDES Permit and also in records created and/or maintained by or for Sonoma which relate to the Plant and related activities as further described in this Notice.

5.      *The date or dates of violation or a reasonable range of dates during which the alleged activity occurred.*

River Watch has examined both RWQCB files and Sonoma's records with respect to the Plant and associate collection system for the period from December 8, 2009 through December 8, 2014, therefore, the range of dates covered  by this Notice is from December 8, 2009 through December 8, 2014.  River Watch may from time to time update this Notice

to include all violations of the CWA by Sonoma which occur during and after the range of dates currently covered. Some violations are continuous, and therefore each day constitutes a violation.

6. *The full name, address, and telephone number of the person giving notice.*

The entity giving this Notice is California River Watch, referred to herein as "River Watch." River Watch is a 501(c)(3) non-profit, public benefit corporation organized under the laws of the State of California, with headquarters located in Sebastopol, California and offices in Los Angeles, California. The mailing address of River Watch's northern California office is 290 S. Main Street, #817, Sebastopol, CA 95472. The mailing address of River Watch's southern California office is 7401 Crenshaw Blvd. #422, Los Angeles, CA 90043. River Watch is dedicated to protect, enhance, and help restore surface and ground waters of California including rivers, creeks, streams, wetlands, vernal pools, aquifers and associated environs, biota, flora and fauna. And to educate the public concerning environmental issues associated with these environs.

River Watch members residing in the area of the Plant and the surrounding watershed have a vital interest in bringing Sonoma's operations at the Plant and associated collection system into compliance with the CWA.

River Watch may be contacted via email: US@ncriverwatch.org or through its legal counsel retained with respect to the issues set forth in this Notice, addressed as follows:

Jack Silver, Esq.
Law Office of Jack Silver
P.O. Box 5469
Santa Rosa, CA 95402-5469
Tel. 707-528-8175
Email: lhm28843@sbcglobal.net

Jerry Bernhaut, Esq.
P. O. Box 5469
Santa Rosa, CA 95402-5469
Direct Tel. 707-595-1852
Email: j2bernhaut@yahoo.com

## BACKGROUND / SONOMA'S OPERATIONS

The Sonoma Valley County Sanitation District managed by the Sonoma County Water Agency, owns and operates the Plant and its associated wastewater collection system consisting of approximately 135 miles of gravity sewer lines, 48 miles of laterals, 3 miles of force main, and 2 pump stations. The discharge of treated wastewater from the Plant is regulated under Order No. R2-2014-0020, NPDES Permit CA0037800, and formerly regulated under Order No. R2-2008-0090. Sonoma provides sewerage services for a

population of approximately 36,000 in the City of Sonoma and the unincorporated areas of Glen Ellen, Boyes Hot Springs, El Verano, and Agua Caliente – all located in the Sonoma Valley area. The Plant has an average dry weather design flow of 3.0 mgd and a peak wet weather design flow of 16 mgd. The Plant discharges secondary and tertiary treated effluent to Schell Slough, and tertiary treated effluent to Wetland Management Unit 1, Wetland Management Unit 3, Napa-Sonoma Salt Marsh, and Fly Bay – all within the San Pablo Bay watershed. These marshlands and ponds, where water is stored for summer recycling, attract thousands of over-wintering and migratory birds.

The NPDES Permit for the Plant and collection system contains several discharge prohibitions related to sewer system overflows ("SSOs"). Discharge Prohibition C of the Permit prohibits the bypass of untreated or partially treated wastewater to waters of the United States, with specified exceptions. Discharge Prohibition E prohibits any SSO that results in a discharge of untreated or partially treated wastewater to waters of the United States. A SSO can violate more than one prohibition at once. Violations of the NPDES Permit are violations of the CWA.

The Plant has a long history of SSOs from its aging sewer lines which have insufficient capacity to handle current flow. Sixty percent of the sewer lines were constructed prior to 1960. Half of those, or thirty percent, were constructed prior to 1940. Structural defects in the collection system, which allow inflow and infiltration (I/I) of rainwater and groundwater into the sewer lines, result in a buildup of pressure, which causes SSOs. Overflows caused by insufficient capacity, blockages and I/I result in the discharge of raw sewage onto land and into gutters, canals, and storm drains which are connected to adjacent surface waters, such as Agua Caliente Creek, Fryer Creek, Nathanson Creek, Pequeno Creek, Sonoma Creek, and Verano Creek – all waters of the United States. Sonoma has been assessing and making improvements to its collection system; however, the problem of significant SSOs, with the vast majority of volume reaching surface waters, persists.

As recorded in the State Water Resource Control Board's California Integrated Water Quality System ("CIWQS") Public SSO Reports, the collection system has experienced 53 SSOs between December 8, 2009 and December 8, 2014, with a combined volume of 361,551 gallons – 358,509 of which reached surface waters. For example, on February 8, 2014, a spill occurred at 18715 Sonoma Highway in Sonoma. The total estimated volume of the spill was 56,250 gallons, all of which reached a surface water impacting Agua Caliente Creek. The spill continued for a day and a half, ending early on February 10th. This is far from the only significant spill. Also on February 8, 2014, a spill of 39,400 gallons occurred at the Rancho Vista Mobile Home Park in Sonoma. None of this spill was recovered and the spill reached Pequeno Creek and Sonoma Creek. Between February 8th and 9th, 2014 a total

of 7 SSOs (including the instances referenced above) totaling 125,320 gallons, all reached surface waters.  Also, on December 23, 2012, Sonoma had 6 SSOs, totaling 39,563 gallons. As with most of the spills that took place, none was recovered, and all reached surface waters.

River Watch's expert believes that many of Sonoma's SSOs were of greater volume than reported.  Sonoma has a history of non-compliance with the SSO reporting requirements mandated by the Statewide General Requirements for Sanitary Sewer Systems, Waste Discharge Requirements Order No. 2006-0003-DWQ ("Statewide WDR") governing the operation of sanitary sewer systems.  The Statewide WDR requires that sewer system operators report SSOs to the CIWQS, and include in that reporting an estimate of the volume of any spill, the volume recovered, and the volume which reached a surface water. The majority of Sonoma's field reports indicate the SSO start time as the same time Sonoma was notified of the SSO.  Some reports indicate the spill start, notification, and operator arrival time as the same. The report of the Sonoma Highway spill mentioned above indicates the time the spill was estimated to have started and the time the agency was notified as 11:15:00, exactly the same time.  In reporting the spill that occurred at Rancho Vista Mobile Home Park, Sonoma's field report lists the estimated spill start time, agency notification time, and operator arrival time all as 14:40:00.

These equivalencies are highly unlikely and result in an under-estimation of the duration of the spill.  Studies have shown that SSOs are usually noticed significantly after they have begun.  Since the volume of SSOs of any significance is estimated by multiplying the estimated flow rate by the duration, Sonoma's common practice of estimating a later than actual start time leads to an under-estimation of both the duration and the volume.

Some of Sonoma's SSO reports do not indicate what method was used to estimate the total volume of the spill; and, when an explanation is provided, it is an estimation of gallons per minute based upon the duration of the spill. River Watch contends that Sonoma is regularly under-estimating the incidence and volume of SSOs reaching surface waters.

In addition to surface overflows which discharge over land into surface waters, underground leakages ("exfiltration") caused by pipeline cracks and other structural defects in the collection system result in discharges to adjacent surface waters via underground hydrological connections.  Significant sections of Sonoma's collection system are old and in need of repair.  Untreated sewage is discharged from cracks, displaced joints, eroded segments, etc., into ground water which is hydrologically connected to surface waters.  River Watch alleges that such discharges are continuous wherever aging, damaged, structurally defective sewer lines in Sonoma's collection system are located adjacent to surface waters

including Agua Caliente Creek, Nathanson Creek, and Sonoma Creek. Surface waters and groundwater become contaminated with fecal coliform, exposing people to human pathogens.  Studies tracing human markers specific to the human digestive system in surface waters adjacent to defective sewer lines in other systems have verified the contamination of the adjacent waters with untreated sewage.[1]

Evidence of exfiltration can be found in mass balance data, "inflow and infiltration" ("I/I")  data, video inspection, and tests of waterways adjacent to sewer lines for nutrients, human pathogens and other human markers such as caffeine.   Exfiltration from Sonoma's collection system is a daily occurrence and a violation of Sonoma's NPDES Permit and the CWA.

Numerous critical habitat areas are found within areas of these SSOs.  Sonoma Creek and surrounding waterways, as well as San Pablo Bay, are relied upon by many endangered and threatened species, including the California brown pelican, California clapper rail, chinook salmon, salt marsh harvest mouse, and steelhead trout.  The San Pablo Bay National Wildlife Refuge is located where Sonoma Creek drains to San Pablo Bay.

The discharges by Sonoma as described herein also constitute a nuisance.  Sonoma's NPDES Permit prohibits the discharge of wastes that lead to the creation of a "nuisance" as defined under the California Water Code.  The term "nuisance" is defined in California Water Code § 13050(m) as anything which meets all of the following requirements: 1) "is injurious to health, or is indecent or offensive to the senses . . . so as to interfere with the comfortable enjoyment of life or property;" 2) "affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal;" and, 3) "occurs during, or as a result of, the treatment or disposal of wastes."

Sonoma Creek, Agua Caliente Creek, Nathanson Creek, San Pablo Bay, and San Francisco Bay have many beneficial uses as defined in the RWQCB's Basin Plan, including fish spawning, preservation of rare and endangered species, and water contact recreation.  SSOs reaching these waterways cause prohibited pollution by unreasonably affecting the beneficial uses of these waters.  Sonoma is also required by its NPDES Permit to comply with narrative standards as set forth in the Basin Plan, used when testing by numeric standards would be inadequate or impractical.  Narrative standards include:

---

[1]

See the Report of Human Marker Study issued in July of 2008 and conducted by Dr. Michael L. Johnson, U.C. Davis water quality expert, performed for the City of Ukiah, finding the presence of human derived bacteria in two creeks adjacent to defective sewer lines.

- Waters shall not contain taste or odor producing substances in concentrations that impart undesirable tastes or odors to fish flesh;

- Waters shall not contain floating material in concentrations that cause nuisance or affect beneficial uses;

- The pH shall not change within 0.5 units of the range needed for COLD or WARM beneficial uses, such as cold water habitat for fish;

- The bacteriological quality of waters shall not be degraded beyond natural background levels; and,

- Natural receiving water temperatures shall not be altered unless allowed by the RWQCB.

River Watch has found nothing in the public record to demonstrate that Sonoma has monitored for and complied with these narrative standards. River Watch is understandably concerned regarding the effects of both surface and underground SSOs on critical habitat in and around the San Pablo Bay and its tributaries.

Sonoma has also had various violations of effluent limits as set forth in its NPDES Permit. Between December 8, 2009 and December 8, 2014 there were 17 violations of effluent limits for copper, 7 violations of effluent limits for chronic toxicity, 4 for cyanide, and 1 for chlorine residual.

River Watch contends that Sonoma's ongoing violations of the CWA pose an immediate threat to public health and the environment, both from surface water impacts of SSOs and from underground leakage of untreated sewage, which impact both surface and groundwater. Furthermore, that the illegal discharge of untreated wastes from Sonoma's collection system is a significant contribution to the degradation of waterways including Sonoma Creek, Agua Caliente Creek, Nathanson Creek, and San Pablo Bay, with serious adverse effects on the many beneficial uses of these waters. River Watch members residing and/or recreating in the area have a vital interest in bringing Sonoma's operations at the Plant and associated collection system into compliance with the CWA.

**RECOMMENDED REMEDIAL MEASURES**

1.      DEFINITIONS

A.      *Condition Assessment*: A report that comprises inspection, rating, and evaluation of the existing condition of a sewer collection system. Inspection is based upon closed circuit television ("CCTV") inspections for gravity mains, manhole inspections for structural defects, and inspections of pipe connections at the manhole. After CCTV inspection occurs, pipe conditions are assigned a grade based on the Pipeline Assessment and Certification Program ("PACP") rating system, developed by the "National Association of Sewer Service Companies." The PACP is a nationally recognized sewer pipeline condition rating system for CCTV inspections.

B.      *Full Condition Assessment*: A Condition Assessment of all sewer lines in the sewer collection system with the exception of sewer lines located within 200 feet of surface waters.

C.      *Surface Water Condition Assessment*: A Condition Assessment of sewer lines in the sewer collection system located within 200 feet of surface waters, including gutters, canals and storm drains which discharge to surface waters.

D.      *Significantly Defective*: A sewer pipe is considered to be Significantly Defective if its condition receives a grade of 4 or 5 based on the PACP rating system. The PACP assigns grades based on the significance of the defect, extent of damage, percentage of flow capacity restriction, and/or the amount of pipe wall loss due to deterioration. Grades are assigned as follows:

> 5 – Most significant defect
> 4 – Significant defect
> 3 – Moderate defect
> 2 – Minor to moderate defect
> 1 – Minor defect

2.      REMEDIAL MEASURES

River Watch believes the following remedial measures are necessary to bring Sonoma into compliance with its NPDES permit and the Basin Plan, and reflect the biological impacts of Sonoma's ongoing non-compliance with the CWA:

A.     SEWAGE COLLECTION SYSTEM INVESTIGATION AND REPAIR

•    Repair or replacement, within 2 years, of all sewer lines in Sonoma's sewage collection system located 200 feet from surface waters, including gutters, canals and storm drains which discharge to surface waters, which have been CCTV'd within the past 10 years and were rated as Significantly Defective, or given a comparable assessment.

•    Within 2 years, the completion of a Surface Water Condition Assessment of sewer lines which have not been CCTV'd during the past ten (10) years.

•    Within 2 years after completion of the Surface Water Condition Assessment Sonoma will:

     »    Repair or replace all sewer lines which have been found to be Significantly Defective;

     »    Repair or replace sewer pipe segments containing defects with a rating of 3 based on the PACP rating system, if such defect resulted in a SSO or, if Sonoma determines such defects are in close proximity to Significantly Defective segments that are in the process of being repaired or replaced; and,

     »    Ensure that sewer pipe segments that contain defects with a rating of 3 based on the PACP rating system that are not repaired or replaced within 5 years after completion of the Surface Water Condition Assessment are re-CCTV'd not more than every 5 years to ascertain the condition of the sewer line segment. If Sonoma determines that the grade-3 sewer pipe segment has deteriorated and needs to be repaired or replaced, Sonoma shall complete the repair or replacement within 2 years after the last CCTV cycle.

•    Beginning no more than 1 year after completion of the Surface Water Condition Assessment, Sonoma shall commence a Full Condition Assessment to be completed within 7 years. Any sewer pipe segment receiving a rating of 4 or 5 based on the PACP rating system shall be repaired or replaced within 3 years of the rating determination.

•    Implementation in Sonoma's Capital Improvements Plan of a program to provide a Condition Assessment of all sewer lines at least every 5 years. Said program to begin 1 year following the Full Condition Assessment described above.

B.     SSO REPORTING AND RESPONSE

•     Modification of Sonoma's Backup and "SSO Response Plan" to include the method or calculations used for estimating total spill volume, spill volume that reached surface waters and spill volume recovered.

•     For Category I Spills, creation of a listing of nearby residents or business owners who have been contacted to attempt to establish the SSO start time, duration, and flow rate, if such start time, duration, and flow rate have not been otherwise reasonably ascertained, (such as from a caller who provides information that brackets a given time that the SSO began).

•     Taking of photographs of the manhole flow at the SSO site using the San Diego Method array, if applicable to the SSO; or, other photographic evidence that may aid in establishing the spill volume.

•     Conduction of water quality sampling and testing whenever it is estimated that 50 gallons or more of untreated or partially treated waste water enters surface waters. Constituents tested for to include: Ammonia, Fecal Coliform, E. coli and a CAM-17 toxic metal analysis.  Sonoma shall collect and test samples from 3 locations – the point of discharge, upstream of the point of discharge, and downstream of the point of discharge. If any of these constituents are found at higher levels in the point of discharge sample or at the downstream sample than in the upstream sample, Sonoma will determine and address the cause of the SSO that enters surface waters and employ the following measures to prevent future overflows:

      »      if the SSO is caused by a structural defect, immediately spot repair the defect or replace the entire line; or,

      »      if the defect is non-structural, such as a grease blockage or vandalism to a manhole cover, perform additional maintenance or cleaning and any other appropriate measures to fix the non-structural defect.

•     Creation of website capacity to track information regarding SSOs; or, in the alternative, the creation of a link from Sonoma's website to the CIWQS SSO Public Reports. Notification to be given by Sonoma to all customers and other members of the public of the existence of the web based program, including a commitment to respond to private parties submitting overflow reports.

• Performance of human marker sampling on creeks, rivers, wetlands and areas of Agua Caliente Creek, Fryer Creek, Nathanson Creek, Pequeno Creek, Sonoma Creek and Verano Creek adjacent to sewer lines to test for sewage contamination from exfiltration.

C.    LATERAL INSPECTION/REPAIR PROGRAM

• Creation of a mandatory private sewer lateral inspection and repair program triggered by any of the following events:

   » Transfer of ownership of the property if no inspection/replacement of the sewer lateral occurred within 10 years prior to the transfer;

   » The occurrence of 2 or more SSOs caused by the private sewer lateral within 2 years;

   » A change of the use of the structure served (a) from residential to non-residential use, (b) to a non-residential use that will result in a higher flow than the current non-residential use, and (c) to non-residential uses where the structure served has been vacant or unoccupied for more than 3 years;

   » Upon replacement or repair of any part of the sewer lateral;

   » Upon issuance of a building permit with a valuation of $25,000.00 or more;

   » Upon significant repair or replacement of the main sewer line to which the lateral is attached.

**VIOLATIONS**

River Watch contends that for the period from December 8, 2009 through December 8, 2014, Sonoma has violated the requirements of its NPDES Permit, the Basin Plan and the Code of Federal Regulations, as those requirements are referenced in the NPDES Permit, with respect to the Plant and associated collection system. Said violations are evidenced in Sonoma's Self Monitoring Reports, testing data compiled in compliance with the NPDES Permit or other orders of the RWQCB, and other documentation filed with the RWQCB or in Sonoma's possession, and as evidenced by unpermitted discharges due to failures in the collection system. Furthermore, these violations are continuing.

The violations include, but are not limited to, the following categories in the NPDES Permit:

**Discharge Prohibitions**

| Violations | Description |
|---|---|

1825 - <u>Collection system subsurface discharge caused by underground exfiltration</u>. This is an event in which untreated sewage is discharged from the collection system prior to reaching the Plant. Underground discharges are alleged to have been continuous throughout the 5-year period from December 8, 2009 through December 8, 2014.

Order No. R2-2008-0090, Discharge Prohibition III.A: "Discharge of treated wastewater at a location or in a manner different from that described in this Order is prohibited."

Order No. R2-2008-0090, Discharge Prohibition III.D: "The bypass of untreated or partially treated wastewater to waters of the United States is prohibited, except as provided for (in) section I.G.2 of Attachment D of this Order."

Order No. R2-2008-0090, Discharge Prohibition III.E: "Any sanitary sewer overflow that results in a discharge of untreated or partially treated wastewater to waters of the United States is prohibited."

Order No. R2-2008-0090, Attachment D - Standard Provisions, I. Standard Provisions - Permit Compliance, D. Proper Operation and Maintenance.

Order No. R2-2014-0020, Discharge Prohibition III.A: "Discharge of treated wastewater at a location or in a manner different from that described in this Order is prohibited."

Order No. R2-2014-0020, Discharge Prohibition III.C: "The bypass of untreated or partially treated wastewater to waters of the United States is prohibited, except as provided for in the conditions stated in Attachment D section I.G."

Order No. R2-2014-0020, Discharge Prohibition III.E: "Any sanitary sewer overflow that results in a discharge of untreated or partially-treated wastewater to waters of the United States is prohibited."

Order No. R2-2014-0020, Attachment D - Standard Provisions, I. Standard Provisions - Permit Compliance, D. Proper Operation and Maintenance.

Evidence to support the allegation of underground discharge of raw sewage exists in Sonoma's own mass balance data regarding the number of connections in the service area, estimates of average daily volume of wastewater per connection, influent flow volumes to the Plant reported in Self Monitoring Reports, video inspection of the collection system, and potentially by the testing of waterways adjacent to sewer lines for nutrients, pathogens and other constituents indicating sewage contamination, such as caffeine and human specific intestinal bacteria.

53 -     SSOs – as evidenced in the CIWQS Interactive Public SSO Reports, including those discussed above, and unrecorded surface overflows witnessed by local residents.

Order No. R2-2008-0090, Discharge Prohibition III.A: "Discharge of treated wastewater at a location or in a manner different from that described in this Order is prohibited."

Order No. R2-2008-0090, Discharge Prohibition III.D: "The bypass of untreated or partially treated wastewater to waters of the United States is prohibited, except as provided for (in) section I.G.2 of Attachment D of this Order."

Order No. R2-2008-0090, Discharge Prohibition III.E: "Any sanitary sewer overflow that results in a discharge of untreated or partially treated wastewater to waters of the United States is prohibited."

Order No. R2-2008-0090, Attachment D - Standard Provisions, I. Standard Provisions - Permit Compliance, D. Proper Operation and Maintenance.

Order No. R2-2014-0020, Discharge Prohibition III.A: "Discharge of treated wastewater at a location or in a manner different from that described in this Order is prohibited."

Order No. R2-2014-0020, Discharge Prohibition III.C: "The bypass of untreated or partially treated wastewater to waters of the United States is prohibited, except as provided for in the conditions stated in Attachment D section I.G."

Order No. R2-2014-0020, Discharge Prohibition III.E: "Any sanitary sewer overflow that results in a discharge of untreated or partially-treated wastewater to waters of the United States is prohibited."

Order No. R2-2014-0020, Attachment D - Standard Provisions, I. Standard Provisions - Permit Compliance, D. Proper Operation and Maintenance.

| Effluent Limit Violations | Description |
| --- | --- |
| 17 - | Effluent Discharge Exceeding the Permit Limit for Copper. |
| | Order No. R2-2008-0090, IV. Effluent Limitations and Discharge Specifications, B. Final Effluent Limitations for Toxics Substances. |
| 7 - | Effluent Discharge Exceeding the Permit Limit for Chronic Toxicity. |
| | Order No. R2-2008-0090, IV. Effluent Limitations and Discharge Specifications, A. Effluent Limitations for Conventional and Non-Conventional Pollutants, 4. Whole Effluent Chronic Toxicity of Discharge Point 001. |
| | Order No. R2-2014-0020, IV. Effluent Limitations and Discharge Specifications, E. Chronic Toxicity. |
| 4 - | Effluent Discharge Exceeding the Permit Limit for Cyanide. |
| | Order No. R2-2008-0090, IV. Effluent Limitations and Discharge Specifications, B. Final Effluent Limitations for Toxics Substances. |
| 1 - | Effluent Discharge Exceeding the Permit Limit for Chlorine Residual. |
| | Order No. R2-2008-0090, IV. Effluent Limitations and Discharge Specifications, A. Effluent Limitations for Conventional and Non- |

Conventional Pollutants, 1. Effluent Limitations for BOD, TSS, pH, Oil and Grease, and Total Chlorine Residual at Discharge Points 001 through 006.

**CONCLUSION**

The violations set forth in this Notice effect the health and enjoyment of members of River Watch who reside and recreate in the affected community. Members of River Watch use the affected watershed for domestic water supply, agricultural water supply, recreation, sports, fishing, swimming, picnicking, hiking, bird watching, photography, nature walks and the like. Their health, use, and enjoyment of this natural resource are specifically impaired by Sonoma's alleged violations of the CWA as set forth in this Notice.

CWA §§ 505(a)(1) and 505(f) provide for citizen enforcement actions against any "person," including a governmental instrumentality or agency, for violations of NPDES permit requirements and for un-permitted discharges of pollutants. 33 U.S.C. §§ 1365(a)(1) and (f), § 1362(5). An action for injunctive relief under the CWA is authorized by 33 U.S.C. § 1365(a). Violators of the Act are also subject to an assessment of civil penalties of up to $37,500 per day/per violation for all violations pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365. See also 40 C.F.R. §§ 19.1-19.4. River Watch believes this Notice sufficiently states grounds for filing suit in federal court under the "citizen suit" provisions of CWA to obtain the relief provided for under the law.

The CWA specifically provides a **60-day** "notice period" to promote resolution of disputes. River Watch strongly encourages Sonoma to contact River Watch within **20 days** after receipt of this Notice Letter to: (1) initiate a discussion regarding the allegations detailed in this Notice, and (2) set a date for a site visit.

In the absence of productive discussions to resolve this dispute, or receipt of additional information demonstrating that Sonoma is in compliance with the strict terms and conditions of its NPDES Permit, River Watch intends to file a citizen's suit under CWA § 505(a) when the 60-day notice period ends.

Very truly yours,

Jack Silver

JS:lhm

cc:     Administrator
        U.S. Environmental Protection Agency
        Ariel Rios Building
        1200 Pennsylvania Avenue, N.W.
        Washington, D.C. 20460

        Regional Administrator
        U.S. Environmental Protection Agency Region 9
        75 Hawthorne St.
        San Francisco, CA 94105

        Executive Director
        State Water Resources Control Board
        P.O. Box 100
        Sacramento, California 95812-0100

        Executive Officer
        Regional Water Quality Control Board
        San Francisco Bay Region
        1515 Clay St., Suite 1400
        Oakland, CA 94612